# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| BRITTANY FLETCHER BECKHAM and LUTZY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | 1:22-cv-04420-MHC |
| BAKER & HOSTETLER LLP and GREGORY GRISSETT, | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>SECOND AMENDED COMPLAINT</u>

COME NOW Plaintiffs Brittany Fletcher Beckham and Lutzy, Inc. (collectively, "Plaintiffs") and file this Second Amended Complaint against Defendants Baker & Hostetler LLP and Gregory Grissett (collectively, "Defendants"), and in support hereof show unto the Court the following:

# TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................... 1

PARTIES, VENUE, AND JURISDICTION ........................................................ 2

FACTUAL AVERMENTS .................................................................................. 5

    A.  Baker & Hostetler. ............................................................................5

    B.  Brittany Beckham, Lutzy, and Their "Smart Closet" Invention. ....................5

    C.  Ms. Beckham Retains Baker & Hostetler to Protect Her Intellectual Property. ......................................................................................7

    D.  Baker & Hostetler Voluntarily Provides Ms. Beckham with Unsolicited Business Advice. ...........................................................................10

    E.  Rosedale Recommends Ms. Beckham Hire Developer Without First Running Conflicts Check. ..................................................................12

    F.  "Good Artists Borrow; Great Artists Steal." ..................................14

    G.  Drafting Beckham Provisional Patent Application. .......................14

    H.  Welspun India Limited Retains Baker & Hostetler to File and Prosecute Multiple Patent Applications. ........................................15

    I.  Grissett Drafts Ms. Beckham's U.S. Non-Provisional and International Applications. .................................................................30

    J.  U.S. Patent No. 9,524,589 B1 Issues to Welspun on December 20, 2016....37

    K.  B&H Advises Ms. Beckham that International Patent Rights are Not Worth Pursuing. ........................................................................38

    L.  Actions of B&H's Attorneys are in Furtherance of and Within the Scope of B&H's Business. ....................................................................40

    M.  Ms. Beckham Replaces B&H with Fish & Richardson. ...............41

    N. Ms. Beckham is "Blocked" by at Least Claim 17 of the Welspun '589 Patent. ...................................................................................................................42

**COUNT I – BREACH OF FIDUCIARY DUTIES** ....................................................... 45

**COUNT II – BREACH OF FIDUCIARY DUTIES (BY DEFENDANT B&H)** ...................... 52

**COUNT III – FRAUDULENT CONCEALMENT/SUPPRESSION OF MATERIAL FACT** .. 54

**COUNT IV – PUNITIVE DAMAGES** ..................................................................... 58

**COUNT V – ATTORNEYS' FEES PURSUANT TO O.C.G.A. § 13-6-11** ........................ 58

**JURY TRIAL DEMANDED** ................................................................................... 59

**PRAYER FOR RELIEF** ......................................................................................... 59

## NATURE OF THE ACTION

1.     At its core, this lawsuit involves the mishandling of patent applications in two substantial ways. First, Defendant Baker & Hostetler ("B&H") simultaneously represented two clients in the prosecution of competing patent applications, Plaintiff Brittany Beckham and Welspun India, Limited ("Welspun"). This is not a case involving different lawyers in different offices of the same firm prosecuting competing patents.   Rather, *the same lawyer—Defendant Greg Grissett*—filed applications for both clients within six weeks of each other. Defendants' failure to disclose this concurrent conflict, much less obtain informed consent to continue representing both clients, resulted in the breach of multiple duties owed to Plaintiffs.  Defendants then intentionally concealed the conflict and instead choose to continue representing both Plaintiffs and Welspun.   Second, despite recognizing that Ms. Beckham's "Wardrobe Builder" and "Wardrobe Planner" were core components of her invention, Defendant Grissett failed to include either in her applications.  Thus, even though Plaintiffs were "first to file," this failure allowed Zeekit Online Shopping, Ltd. (subsequently acquired by Walmart) to obtain patent protection for core features of Plaintiffs' technology to the exclusion of Plaintiffs' rights.

2.    Defendants breached multiple duties owed to Plaintiffs and, as a result, are liable for special and general damages, including emotional distress and uncapped punitive damages.

<u>PARTIES, VENUE, AND JURISDICTION</u>

3.    Plaintiff Brittany Fletcher Beckham is a resident of Fulton County, Georgia and has authority and standing to bring this lawsuit.

4.    Plaintiff Lutzy, Inc. is a foreign Delaware corporation authorized to transact business in Georgia with its principal place of business in Georgia.

5.    Defendant Baker & Hostetler, LLP ("B&H") is an Ohio limited liability partnership authorized to transact business in the State of Georgia. Defendant B&H accepted service of summons and Plaintiffs' original Complaint on October 6, 2022 [Doc. 1 p.2 ¶2].

6.    Defendant B&H has availed itself of the privilege of doing business in the State of Georgia and is, therefore, subject to the personal jurisdiction of and in this Court.

7.    Defendant Gregory Grissett ("Grissett") is a resident of the state of New Hampshire and accepted service of summons and Plaintiffs' original Complaint on October 10, 2022 [Doc. 1 p.2 ¶2]. Defendant Grissett is subject to the specific personal jurisdiction of this Court pursuant to O.C.G.A. § 9-10-91(1), (2), and/or (3).

8.     Defendant Grissett has committed intentional tortious acts and omission within the State of Georgia, including breaches of fiduciary duties and fraudulent concealment/suppression of material facts.  Between 2015 and 2018, Defendant Grissett regularly and routinely conducted business in Georgia through his correspondence with Ms. Beckham via telephone, email, and text message while Ms. Beckham was physically present in the State of Georgia.  Defendant Grissett's correspondence with Ms. Beckham is the basis for liability and, therefore, constitutes tortious acts committed in Georgia.  By fraudulently concealing material information in communications via telephone, email, and text message with Ms. Beckham, Defendant Grissett committed tortious conduct in Georgia.

9.     Defendant Grissett's correspondence directed to Ms. Beckham in Georgia was not random, isolated, or fortuitous.   Rather, Defendant Grissett understood that Ms. Beckham was a resident of Georgia and was physically present in Georgia for a substantial amount of time.  Defendant Grissett's correspondence directed to Ms. Beckham, both individually and as the principal of Plaintiff Lutzy, in Georgia relates specifically to Plaintiffs' causes of action and, in fact, has given rise to them.  Defendant Grissett sought to profit from his relationship with Plaintiffs, and that relationship was garnered through and furthered by numerous telephone calls, text messages, and email contacts directed to Ms. Beckham while she was physically present in Georgia.

10. Plaintiffs' claims arise out of and/or relate to Defendant Grissett's intentional acts directed at them in Georgia. Defendant Grissett's representation of Plaintiffs involved the filing of multiple patent applications. Said patent applications were finalized, approved, and signed by Plaintiffs in Georgia, thus resulting in the "consummation of a transaction" in Georgia. Defendant Grissett's purposeful availment of the privilege of conducting activities in Georgia has given him fair warning that he might be hailed before a court in Georgia.

11. This Court's exercise of personal jurisdiction over Defendant Grissett comports with traditional notions of fairness and substantial justice, so as to satisfy due process. Defendants B&H and Grissett are represented by the same counsel, thus there are no logistical or financial difficulties in defending a case in Georgia. Georgia has a legitimate interest in protecting residents from the unscrupulous actions of non-resident lawyers and national law firms who represent Georgia residents. Plaintiffs have a substantial interest in litigating in the state where they are domiciled. Defendants derived substantial revenue from services rendered to Plaintiffs in Georgia and their purposeful dealings with Ms. Beckham made litigation in Georgia reasonably foreseeable.

12. Venue and jurisdiction are proper in this Court pursuant to 28 U.S.C. §§ 1331, 1338, 1441, and 1446.

4

**FACTUAL AVERMENTS**

**A.    Baker & Hostetler.**

13.    Defendant B&H is national law firm with seventeen (17) offices across the country, including offices in Atlanta, Georgia.

14.    According to Defendant B&H's website as of August 2, 2022, it has 107 lawyers in its Atlanta, Georgia office, including 38 partners.

15.    Jeffrey H. Rosedale, Ph.D. is a partner in Defendant B&H's Philadelphia, Pennsylvania office.

16.    At the time of the events giving rise to this action, Thomas J. Clare ("Clare") was a patent attorney in Defendant B&H's Philadelphia, Pennsylvania office.

17.    Mr. Clare has since left Defendant B&H.  Mr. Clare is currently of counsel at Ice Miller in Philadelphia, Pennsylvania.

18.    At the time of the events giving rise to this action, Gregory Grissett was an associate patent attorney in Defendant B&H's Philadelphia, Pennsylvania office.

19.    Mr. Grissett has since left the employ of Defendant B&H.  Mr. Grissett is currently an attorney at Offit Kurman in Plymouth Meeting, Pennsylvania.

**B.    Brittany Beckham, Lutzy, and Their "Smart Closet" Invention.**

20.    Ms. Beckham is an inventor and entrepreneur.

21.    Ms. Beckham developed a love for technology at a young age.

5

22.     As Ms. Beckham grew older, she began to contemplate how she could combine her love for technology with her passion for fashion.

23.     By late 2014, Ms. Beckham is developing her "Smart Closet" software application.

24.     Ms. Beckham seeks to revolutionize the fashion industry with her "Smart Closet" invention.

25.     Ms. Beckham's Smart Closet invention fundamentally changes the way consumers purchase and organize their wardrobes.

26.     Ms. Beckham's Smart Closet invention includes an interactive wardrobe software application, augmented reality system, and related methods.

27.     Applying novel concepts of machine learning, Ms. Beckham's inventions integrate user inputs with networked data to compile digital outfits. Among other things, this assists the user in deciding what to wear and pack for a trip.

28.     Ms. Beckham's Smart Closet also assists users in making informed purchasing decisions by allowing them to "try on" items virtually before purchasing.

29.     Ms. Beckham's Smart Closet incorporates a customizable "human form model" based on the user's physique.   By overlaying wardrobe items on the "human form model," the user sees how the item will fit on his or her body.   The user can

then perform digital alterations to customize how the item fits on the "human form model."

30.     The "Wardrobe Planner" and "Wardrobe Builder" functions of Ms. Beckham's Smart Closet invention incorporate wardrobe item images to assist the user in planning and coordinating outfits.  These images are either uploaded by the user directly or mined from internet sources.  Images of a top and bottom, for example, are then matched based on user inputs and machine learning to suggest outfits for given occasions.

31.     As the user shows the computer what he/she likes, the Smart Closet learns the user's preferences to curate outfits.

32.     Ms. Beckham named here company, Lutzy, Inc., after her friend and form Auburn University football player, Philip Lutzenkirchen.

33.     Defendant B&H, on behalf of Ms. Beckham, served as the incorporator for Lutzy and on April 3, 2017 filed a Certificate of Incorporation of Lutzy Inc. with the Delaware Secretary of State.

34.     On November 5, 2018, Ms. Beckham assigned her interests in her patent applications to Lutzy.

**C.     Ms. Beckham Retains Baker & Hostetler to Protect Her Intellectual Property.**

35.     In January 2015, Ms. Beckham is introduced to Defendant B&H lawyer, Jeffrey Rosedale ("Rosedale").

36.     On January 30, 2015, Ms. Beckham has her first telephone call with Rosedale to discuss potentially retaining Defendant B&H to file multiple patents to protect her Smart Closet invention.

37.     Then B&H associate attorney, Greg Grissett, joins the call with Rosedale and Ms. Beckham.

38.     Ms. Beckham begins disclosing the details of her Smart Closet invention to Defendant B&H following her January 30, 2015 telephone call with Rosedale and Grissett.

39.     The next day, before Ms. Beckham retains Defendant B&H, Rosedale convinces Ms. Beckham to terminate her software developer.  *See*, January 31, 2015 10:36 AM email from Rosedale re: I see problems in the Toptal agreement attached hereto as **Exhibit A**.

40.     Rosedale advises Ms. Beckham that she needs to work "with a more sophisticated technology development firm with engineers here in the U.S. who have a known and highly regarded track record" and that Defendant B&H "need[s] to surround [her] with top-end sophisticated people to help [her] make this BIG." *Id*.

41.     In a February 3, 2015 email, Rosedale confirms his understanding of Ms. Beckham's invention.  Said Feb. 3, 2015 email from Rosedale is attached hereto as **Exhibit B**.

42.     Rosedale also outlines the "patent strategy" that Defendant B&H will pursue if Ms. Beckham decides to hire B&H.  Rosedale's patent strategy includes the filing of at least eight (8) utility patents on Ms. Beckham's behalf:

I. IP Protection
    A. Utility patents (in no particular order...we should figure out what to work on first, second, third, etc. Total IP protection can go beyond our commercialization plans; it should try to include our future plans)
        1. B/W Styles Closet - (Our main interface IP - choices w/ lookup tables (weather, events, styles) based on what's in closet/what's in suitcase)
        2. AI-Learning Smart Styles Closet - based on prior history (history can be yours', a friends', of others', of pros')
        3. DressMe App
        4. Socially Networked Style Closets
        5. Wardrobe Builder - barcode scanner at point of purchase, QR Code, RFID tag (TC Clare on team), future. App function in Internet purchase subroutine to automatically add purchase to wardrobe when it arrives
        6. Wardrobe Planner (V1.0) (choose styles to wear for x days (based on location, weather, season, event, work or weekend, etc); purchase recommendations based on closet and laundry inventory; laundry, dry cleaner, travel planner, suitcase planner, carry on planner)
        7. Wardrobe Smart Tracker (V2.0) - IOT (Internet of Things) New to Industry tracking/coding standards and technology.  Networked.
        8. Big Data Analytics and Revenue generation

Ex. B-1.

43.     Regarding the "Wardrobe Builder" function of Ms. Beckham's Smart Closet, Rosedale states "barcode scanner at point of purchase, QR Code, RFID tag ([Tom ']TC['] Clare on team), future."  Ex. B-1.

44.     A QR, or quick response, code is a type of two-dimensional barcode.

45.     RFID, or radio frequency identification, is similar to barcoding in that data from a tag or label are captured by a device that stores the data in a database.

46.     On February 10, 2015, Ms. Beckham formally retains Defendant B&H "to represent [her] in connection with developing a company and intellectual property for commercializing [her] smart wardrobe fashion system ('the Matter'), for example, by filing one or more patent applications…."  *See* February 10, 2015 engagement letter attached hereto as **Exhibit C**.

**D.** **Baker & Hostetler Voluntarily Provides Ms. Beckham with Unsolicited Business Advice.**

47.     From the outset, B&H interjects itself into Ms. Beckham's business affairs.

48.     Early in the relationship, B&H attorney Jeffrey Rosedale makes statements and representations to Ms. Beckham venturing far beyond legal advice including, without limitation, the following:

(a)     "[E]xploring with you just how BIG your app/network/social media fashion system can become some day [*sic*];"

(b)     "We'll be thinking and working on an initial strategy plan to help you … launch your new business;"

(c)     "I really could have used your app this morning;"

(d)     "[T]yping out an outline of business plan Go-Dos for [Ms. Beckham] to think about;"

(e)     Recommending names for Ms. Beckham's company ("I just thought of this name");

(f)     "We need to surround you with top-end sophisticated people to help you make this BIG:"

(g)     "I would feel A LOT BETTER if you worked with a more sophisticated technology development group;"

(h)   "I don't get the sense that [current software application developer] can help you become BIG;"

(i)   Setting up and conducting interviews with potential new software application developer ("Initially, we'll just get a feel for Eric and make sure he's the right guy"); and

(j)   Promising to monitor software application development to ensure "everything stays on track/on budget" by holding regular status update meetings with developer.

49.   Based on Mr. Rosedale's statements and representation, Ms. Beckham believed that B&H had her best interests in mind.

50.   By June 2015, Ms. Beckham is becoming concerned that B&H is billing her for work she did not authorize.

51.   On June 15, 2015, Ms. Beckham informs Mr. Rosedale that she did not authorize him to draft and "discuss 'business plan ideas and strategies'" and that she should not be billed for his time doing such.  *See* email chain ending June 15, 2015 at 2:07 PM attached hereto as **Exhibit C**.

52.   Ms. Beckham also voices concern that she is "being billed for random things that [she] do[es]n't feel were necessary, and just and excuse to increase the billing cost."  Ex. C-3.

53.     By August 2015, Ms. Beckham is becoming increasingly frustrated by Mr. Rosedale.

54.     On August 11, 2015, Ms. Beckham informs Mr. Rosedale that she is "so tired of having to communicate [her] concerns with [him]." *See*, August 11, 2015 2:26 AM email from Ms. Beckham attached hereto as **Exhibit D** at Ex. D-2. Ms. Beckham also asks Mr. Rosedale "[h]ow many times do I have to reiterate all of … [my] concerns?  I am just so tired of it.  Call me, ask me, email me, and communicate!  I am so tired of more people becoming involved WITHOUT my permission."  Ex. D-2.

## E.    **Rosedale Recommends Ms. Beckham Hire Developer Without First Running Conflicts Check**.

55.     On February 13, 2015, Rosedale introduces Clare (for a second time) as an "expert" in "RFID" technology.  *See*, February 13, 2015 2:49 AM email from Rosedale re: Hopefully wonderful news! attached hereto as **Exhibit F**.

56.     Per Rosedale, Clare "knows of a certain tiny [RFID] version that can be sewn into and track clothing, and can withstand washing or dry-cleaning.  So as clothes go into your closet they are automatically added into your wardrobe.  The RFID scanner could be a smartphone or a separate scanning device hidden near your closet door…wow!"  Ex. F-1.

57.     As Ms. Beckham's "very cautious IP Lawyer," Rosedale informs Ms. Beckham that he will "verify" Eckstein's credentials as a purported "fantastic app developer." *Id*.

58.     Rosedale represents that Clare and him are meeting Eckstein "to ensure that" Eckstein does "not have a conflict of interest," "is sufficiently technologically sophisticated" and that he "has developed high-quality apps for satisfied clients." *Id*.

59.     Unbeknownst to Ms. Beckham, Clare and Eckstein worked together for years at Checkpoint Systems.  During that time, Clare and Eckstein coinvented several technologies.  In fact, Clare and Eckstein are co-inventors on multiple patents, including at least two (2) RFID patents.

60.     As of February 2015, Clare and Eckstein continue to be good friends with whom the other would "trust his life."

61.     Clare knows as of February 13, 2015, that Eckstein has a potential conflict of interest, that Eckstein is not sufficiently technologically sophisticated, and that Eckstein has not developed high-quality applications for satisfied clients.

62.     As of February 13, 2015, Rosedale knows that Eckstein has no prior experience developing AI applications and that Eckstein lacks the requisite technological skill to successfully develop Ms. Beckham's Smart Closet platform.

63.     The failures of Clare and Rosedale to share with Ms. Beckham their knowledge of the fact that Eckstein is completely unqualified cost Ms. Beckham over $250,000.00 in fees paid to Eckstein and put the development of her Smart Closet years behind schedule.  Moreover, the delay in Plaintiffs' ability to launch their Smart Closet platform has also resulted in the loss of market position and significant revenue.

**F.      "Good Artists Borrow; Great Artists Steal."**

64.     On February 26, 2015, Rosedale tells Ms. Beckham "BTW, there's a great famous quote by Pablo Picasso, which IP lawyers are not supposed to tell their clients about: *Good artists borrow.  Great artists steal*." *See*, Feb. 26, 2015 6:02 PM email from Rosedale attached hereto as **Exhibit G**.

**G.      Drafting Beckham Provisional Patent Application.**

65.     On March 13, 2015, Grissett sends Ms. Beckham his first set of draft claims for her patent application.

66.     A month later, on April 13, 2015, Grissett sends Ms. Beckham a set of revised draft claims for her patent application.  *See*, April 13, 2015 6:22 PM CDT email from Grissett attached hereto as **Exhibit H**.

67.     Grissett's April 13, 2015 email outlines his understanding of Ms. Beckham's invention, including "garment wire frame using two points to define a

fashion item," artificial intelligence ("expert system"), and augmented reality ("black/white closet concept and building a garment wire frame"). Ex. H-1.

68. By May 9, 2015, Grissett tells Ms. Beckham that he is "about half way [*sic*] through the patent application."

69. On May 19, 2015, Grissett again describes his understanding of Ms. Beckham's invention and states that "the application is about 70%-75% complete."

70. By June 16, 2015, Grissett is still not finished with Ms. Beckham's patent application.

71. Finally, on July 7, 2015, Grissett files a provisional patent application on behalf of Ms. Beckham for a "System and Network for Outfit Planning and Wardrobe Management." A true and correct copy of the July 7, 2015 provisional patent application is attached hereto as **Exhibit I**.

72. The provisional patent application includes "wireframe" as element of seven (7) claims. *See*, Ex. I-60 (Claims 26, 30, 31, and 32), Ex. I-64 (Claim 63), and Ex. I-66 (Claims 74 and 75).

### H. Welspun India Limited Retains Baker & Hostetler to File and Prosecute Multiple Patent Applications.

73. At some point between July 7 and July 31, 2015, Welspun India Limited retains Defendant B&H to prosecute multiple patent applications on its behalf.

74.     According to Welspun's website, it is "the world's leading Home Textile solution provider[], steered by a robust team of 20,000 people."[1]

75.     Welspun offers "a wide variety of home textile brands in India and [has] a product portfolio in three major categories: [Bed, Bath, & Flooring]."[2]

76.     Welspun does not make, sell, or distribute "garments."

77.     Prior to agreeing to take Welspun on as a client, no one at B&H discloses to Ms. Beckham that there is a potential conflict of interest.

78.     Prior to taking on Welspun as a client, no one at B&H asks Ms. Beckham to waive a conflict of interest, actual or potential, resulting from B&H's concurrent representation of Welspun.

79.     Grissett, Defendant B&H's purported textile expert, is assigned responsibility for drafting Welspun's patent applications.

80.     By August 31, 2015, Grissett completes Welspun's first patent application in, at most, seven (7) weeks.

81.     On August 31, 2015, Welspun files a patent application drafted by Grissett in India for an "Interactive Textile Article and Augmented Reality System" (3334/MUM/2015) ("Welspun's India Application" or the "India Application").  A

---

[1] https://www.welspun.com/welspun-india-limited.php.
[2] https://www.welspunindia.com/about-us

true and correct copy of said India Application is attached hereto as **Exhibit J** at Ex. HJ16 – Ex. J-58.

82.    Welspun's India Application drafted by Grissett, as highlighted below, defines "textile articles" as including "garments:"

[0003]    Textile articles, such as garments, bedding, curtains, etc., are ubiquitous products. In a given day, textile articles define much of our sensory experience (e.g. sound, sight, touch, smell). But advances in textile technologies has led to new interactions between the user and textile materials. For example, wearable technologies includes sensors embedded into the fabric structure of a garment. The sensors measure physiological parameters and signal data can be transmitted to a linked computing device. Textile articles, however, as ubiquitous as they are, have not yet converged in a meaningful way with the nearly ubiquitous digital technologies brought about by modern mobile devices and advanced communication networks.

Ex. J-20.

83.    Welspun's India Application defines "textile articles" as including "garments" despite the fact that Welspun does not make, sell, or distribute "garments."

84.    On September 16, 2015, Grissett files a nonprovisional application on behalf of Welspun with the U.S. Patent and Trademark office for an "Interactive Textile Article and Augmented Reality System," Application No. 14/856,250 ("Welspun's U.S. Non-Provisional Application"). A true and correct copy of Welspun's U.S. non-provisional application is attached hereto as Ex. J-188 – Ex. J-213.

85.    Welspun's   U.S.   Non-Provisional   Application,   like   the   India
Application, defines "textile article" as including "garments."

> [0004]   Textile articles, such as garments, bedding, curtains, etc., are ubiquitous products. In a given day, textile articles define much of our sensory experience (e.g. sound, sight, touch, smell). But advances in textile technologies has led to new interactions between the user and textile materials.  For example, wearable technologies includes sensors embedded into the fabric structure of a garment. The sensors measure physiological parameters and signal data can be transmitted to a linked computing device. Textile articles, however, as ubiquitous as they are, have not yet converged in a meaningful way with the nearly ubiquitous digital technologies brought about by modern mobile devices and advanced communication networks.

Ex. J-188.[3]

86.    The specifications and claims in Welspun's India and U.S. Applications
are identical.  *Compare* Ex. J-20 – Ex. J-44 and Ex. J-188 – Ex. J-212.

87.    In drafting Welspun's Applications, Grissett copies a substantial
portion of the specifications from Ms. Beckham's Provisional Application verbatim.

88.    The language highlighted in yellow below appears verbatim in the
patent applications Grissett drafted for Ms. Beckham and Welspun:

---

[3] Grissett defined "textile articles" to includes "garments" in a second U.S. patent application filed on September 25, 2015 (Appl. No.: 62/232,443).  A true and correct copy of said Sept. 25, 2015 U.S. provisional patent application is attached hereto as **Exhibit K**.

| **Beckham – Filed July 7, 2015** | **Welspun – Filed August 31, 2015** |
|---|---|
| [0048] Referring to Figure 1, an embodiment of the present disclosure is a system 1 including at least one server computing device 10, a plurality of computing devices 20a, 20b, 20c, ... 20n, in electronic communication with the server computing device 10, and one or more software applications 30s and 30c (Figures 2A and 2B) implemented across computing devices 10 and 20a, 20b, 20c ... 20n. Each computing device 20a, 20b, 20c, ... 20n may be associated with a different person or user. The software applications are also configured to permit several of up to all of the users to self-associate such that specific groups of computing devices 20a, 20b, and 20c ... 20n are connected via a social network 40. The social network 40 is illustrated schematically in dashed lines in Figure 1 and will be further described below. Accordingly, the system 1 is configured to acquire, develop, and manage wardrobe data for: a) an individual user, b) multiple users connected via the social network 40, and c) all of the users. For purposes of clarifying how the software application is implemented across the various computing devices, reference number 20 is used interchangeably with reference numbers 20a, 20b, 20c ... , 20n unless noted otherwise. In addition, the present disclosure describes software applications implemented over system components and configured to execute various steps in the methods described below. It should be appreciated that a software application can implement | [0026] Referring to Figure 2, an embodiment of the present disclosure is a system 1 including at least one server computing device 10, a plurality of computing devices 20a, 20b, 20c, ... 20n, in electronic communication with the server computing device 10, and one or more software applications 30s and 30c (see Figures 3 and 4) implemented across computing devices 10 and 20a, 20b, 20c ... 20n. Each computing device 20a, 20b, 20c, ... 20n may be associated with a different person or user. Furthermore, one or more up to all of the computing devices 20a-20n can be associated via social network. For purposes of clarifying how the software application is implemented across the various computing devices, reference number 20 is used interchangeably with reference numbers 20a, 20b, 20c ... , 20n, unless noted otherwise. In addition, the present disclosure describes software applications implemented over system components and configured to execute various steps in the methods described below. It should be appreciated that a software application can implement steps in the described methods utilizing all of the system components or just portions of the system components. Furthermore, the software applications are described below in singular form. It should be appreciated that multiple software applications may interface to perform the described functions and multiple applications can run on more than one |

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| steps in the methods utilizing all of the system components or just portions of the system components. Furthermore, the software applications are described below in singular form. It should be appreciated that multiple software applications may interface to perform the described functions, and multiple applications can run on more than one computing device to implement the methodologies described herein. | computing device to implement the methodologies described herein. |
| [0049] Continuing with reference to Figure 1, the system 1 is implemented via exemplary architecture that includes computing devices 10, 20a, 20b, 20c ... ,20n in electronic communication with each other via a common communications network, such as, for example the Internet. As illustrated, the computing devices 20a, 20b, 20c ... 20n and server computing device 10 are arranged in a client-server architecture. The server computing device 10 can receive and transmit data to other computing devices 20 within a defined social network group. In addition, one up to all the computing devices 20 can receive information from the other computing devices 20. And one up to all of the computing devices 20 can transmit information to the other computing devices 20. Furthermore, one or all of the computing devices 10, 20 can access information on the other computing devices 10, 20. "Access" or | [0027] Continuing with reference to Figure 2, the system 1 can be implemented via exemplary architecture that includes computing devices 10, 20a, 20b, 20c ... , 20n in electronic communication with each other via a common communications network, such as, for example, the Internet. As illustrated, the computing devices 20a, 20b, 20c ... 20n and server computing device 10 are arranged in a client-server architecture. The server computing device 10 can receive and transmit data to other computing devices 20 via the communications network. In addition, one up to all the computing devices 20 can receive information from the other computing devices 20. And one up to all of the computing devices 20 can transmit information to the other computing devices 20. Furthermore, one or all of the computing devices 10, 20 can access information on the other computing |

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| "accessing" as used herein can include retrieving information stored in memory on a computing device. For instance, "access" or "accessing" includes sending instructions via the network from server computing device 10 to computing device 20a so as to cause information to be transmitted to the memory of the computing device 20a for access locally by the computing device 20a. In addition or alternatively, "access" or "accessing" can include the server computing device 10 sending an instruction to computing device 20a to access information stored in the memory of the computing device 20a. Reference to server computing device 10 and computing device 20a in this paragraph is exemplary and are used to only clarify use of words "access" or accessing." | devices 10, 20. "Access" or "accessing" as used herein can include retrieving information stored in memory on a computing device. For instance, "access" or "accessing" includes sending instructions via the network from server computing device 10 to computing device 20a so as to cause information to be transmitted to the memory of the computing device 20a for access locally by the computing device 20a. In addition or alternatively, "access" or "accessing" can include the server computing device 10 sending an instruction to computing device 20a to access information stored in the memory of the computing device 20a. Reference to server computing device 10 and computing device 20a in this paragraph is exemplary and are used to only clarify use of words "access" or accessing." |
| [0050] Figure 1 illustrates a client-server network. But the software application can be implemented over any number of network configurations. For example, in alternate embodiments, the computing devices 20a, 20b, 20c ... 20n are configured as a peer-to-peer network architecture. In still other alternative embodiments, the computing devices 20a, 20b, 20c ... 20n can be arranged in a ring-type network architecture. Further, the software application can be implemented across computing devices arranged on a network that includes aspects of a client-server network, peer-to-peer network, ring-type network, and/or | [0028] Figure 2 illustrates a client-server network. But the software application can be implemented over any number of network configurations. For example, in alternate embodiments, the computing devices 20a, 20b, 20c ... 20n are configured as a peer-to-peer network architecture. In still other alternative embodiments, the computing devices 20a, 20b, 20c ... 20n can be arranged in a ring-type network architecture. Further, the software application can be implemented across computing devices arranged on a network that includes aspects of a client-server network, peer-to-peer network, ring-type network, and/or |

21

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| other network architectures known to a person of ordinary skill in the art. Accordingly, it should be appreciated that numerous suitable alternative communication architectures are envisioned. | other network architectures known to a person of ordinary skill in the art. Accordingly, it should be appreciated that numerous suitable alternative communication architectures are envisioned for implementing the software application 30 on a user's computing device. |
| [0051] Turning to Figure 2A, the computing device 20 is configured to receive, process, and store various information used to implement one or more software application, such as client software application 30c. As described above each computing device 20a, 20b, 20c ... , 20n may be associated with a particular user. It will be understood that the hardware components of computing device 20 can include any appropriate device, examples of which include a portable computing device, such as a laptop, tablet or smart phone, or other computing devices, such as a desktop computing device or a server-computing device. | [0029] Turning to Figure 3, the computing device 20 is configured to receive, process, and store various information used to implement one or more software applications, such as client software application 30c. It will be understood that the hardware components of computing device 20 can include any appropriate device, examples of which include a portable computing device, such as a laptop, tablet or smart phone, or other computing devices, such as, a desktop computing device or a server-computing device. |
| [0052] As illustrated in Figure 2A, the computing device 20 includes one or more processors 22, a memory 24, an input/output 26, and a user interface (UI) 28. It is emphasized that the operation diagram depiction of the computing device 20 is exemplary and not intended to imply a specific implementation and/or configuration. The processor 22, memory 24, input/output portion 26 and user interface 28 can be coupled together to allow communications therebetween, | [0030] As illustrated in Figure 3, the computing device 20 includes one or more processors 22, a memory 24, an input/output 26, and a user interface (UI) 28. It is emphasized that the operation diagram depiction of the computing device 20 is exemplary and not intended to imply a specific implementation and/or configuration. The processor 22, memory 24, input/output portion 26 and user interface 28 can be coupled together to allow communications therebetween, |

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| and are can interface with the software application 30c. The software application 30c may include application programmatic interface (API). As should be appreciated, any of the above components may be distributed across one or more separate devices. | and can interface with the client software application 30c. The client software application 30c may include an application programmatic interface (API). As should be appreciated, any of the above components may be distributed across one or more separate devices. The computing device 20 can include scanning device, such a camera that captures an image of the design object 120. For instance, the camera may include charge-coupled device (CCD) or a contact image sensor (CIS) as the image sensor. |
| [0053] Continuing with Figure 2A, the memory 24 can be volatile (such as some types of RAM), non-volatile (such as ROM, flash memory, etc.), or a combination thereof, depending upon the exact configuration and type of processor 22. The computing device 20 can include additional storage (e.g., removable storage and/or non-removable storage) including, but not limited to, tape, flash memory, smart cards, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic storage or other magnetic storage devices, universal serial bus (USB) compatible memory, or any other medium which can be used to store information and which can be accessed by the computing device 20. | [0031] Continuing with Figure 3, the memory 24 can be volatile (such as some types of RAM), non-volatile (such as ROM, flash memory, etc.), or a combination thereof, depending upon the exact configuration and type of processor 22. The computing device 20 can include additional storage (e.g., removable storage and/or non-removable storage) including, but not limited to, tape, flash memory, smart cards, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic storage or other magnetic storage devices, universal serial bus (USB) compatible memory, or any other medium which can be used to store information and which can be accessed by the computing device 20. |
| [0054] Continuing with Figure 2A, in various embodiments, the input/output portion 26 includes an antenna or an electronic connector for wired connection, or a combination thereof. In | [0032] Continuing with Figure 3, in various embodiments, the input/output portion 26 includes an antenna or an electronic connector for wired connection, or a combination thereof. In |

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| some implementations, input/output portion 26 can include a receiver and transmitter, transceiver or transmitter-receiver. The input/output portion 26 is capable ofreceiving [*sic*]² and/or providing information pertaining to communication with a network such as, for example, the Internet. As should be appreciated, transmit and receive functionality may also be provided by one or more devices external to computing device 20. For instance, the input/output portion 20 can be in electronic communication with a receiver. | some implementations, input/output portion 26 can include a receiver and transmitter, transceiver or transmitter-receiver. The input/output portion 26 is capable ofreceiving [*sic*]⁴ and/or providing information pertaining to communication with a network such as, for example, the Internet. As should be appreciated, transmit and receive functionality may also be provided by one or more devices external to the computing device 20. For instance, the input/output portion 26 can be in electronic communication with a receiver. |
| [0055] Referring to Figure 2A, the user interface 28, which can include an input device and/or display (input device and display not shown) that allows a user to communicate with the computing device 20. The user interface 28 can include inputs that provide the ability to control the computing device 20, via, for example, buttons, soft keys, a mouse, voice actuated controls, a touch screen, movement of the computing device 20, visual cues (e.g., moving a hand in front of a camera on the computing device 20), or the like. The user interface 28 can provide outputs, including visual displays, such as exemplary display screens illustrated in Figures 12A-28. Other outputs can include audio information (e.g., via speaker), mechanically (e.g., via a vibrating mechanism), or a combination thereof. In various configurations, the | [0033] Referring to Figure 3, the user interface 28, which can include an input device and/or display (input device and display not shown) that allows a user to communicate with the computing device 20. The user interface 28 can include inputs that provide the ability to control the computing device 20, via, for example, buttons, soft keys, a mouse, voice actuated controls, a touch screen, movement of the computing device 20, visual cues ( e.g., moving a hand in front of a camera on the computing device 20), or the like. The user interface 28 can provide outputs, including visual displays. Other outputs can include audio information (e.g., via speaker), mechanically (e.g., via a vibrating mechanism), or a combination thereof. In various configurations, the user interface 28 can include a display, a touch screen, a keyboard, a mouse, an |

---

⁴ Typographical error "ofreceiving" appears in both applications.

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| user interface 28 can include a display, a touch screen, a keyboard, a mouse, an accelerometer, a motion detector, a speaker, a microphone, a camera, or any combination thereof. The user interface 28 can further include any suitable device for inputting biometric information, such as, for example, fingerprint information, retinal information, voice information, and/or facial characteristic information, for instance, so as to require specific biometric information for access to the computing device 20. It should be appreciated that the computer devices can operate via any suitable operating system, such as Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS. Furthermore, the software application can operate with any of the aforementioned operation systems. | accelerometer, a motion detector, a speaker, a microphone, a camera, or any combination thereof. The user interface 28 can further include any suitable device for inputting biometric information, such as, for example, fingerprint information, retinal information, voice information, and/or facial characteristic information, for instance, so as to require specific biometric information for access to the computing device 20. It should be appreciated that the computer devices can operate via any suitable operating system, such as Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS. Furthermore, the software application can operate with any of the aforementioned operation systems. |
| [0056] Figure 2B is an operation diagram of the server computing device 10. The server computing device 10 includes one or more processors 12, a memory 14, an input/output 16, and a user interface (UI) 18, and on or more software applications, such as server application 30s. The processor 12, memory 14, input/output portion 16 and interface 18 can be coupled together to allow communications therebetween. As should be appreciated, any of the above components may be distributed across one or more separate server computing devices. The server computing device processor 12, memory 14, input/output 16, and | [0034] Figure 4 is an operation diagram of the server computing device 10. The server computing device 10 includes one or more processors 12, a memory 14, an input/output 16, and a user interface (UI) 18, and one or more software applications, such as server software application 30s. The server software application 30s may also include an application programmatic interface (API). The processor 12, memory 14, input/output portion 16 and interface 18 can be coupled together to allow communications therebetween. As should be appreciated, any of the above components may be distributed across |

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| interface 18 are similar to the processors 22, memory 24, input/output 26, and interface 28 described above with respect computing device 20. It should be appreciated that the server computer device can operate via any suitable operating system, such as Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS. It is emphasized that the operation diagram depiction of the server computing device 10 is exemplary and not intended to imply a specific implementation and/or configuration. | one or more separate server computing devices. The server computing device processor 12, memory 14, input/output 16, and interface 18 are similar to the processor 22, memory 24, input/output 26, and interface 28 described above with respect computing device 20. It should be appreciated that the server computer device can operate via any suitable operating system, such as Android, BSD, iOS, Linux, OS X, QNX, Microsoft Windows, Windows Phone, and IBM z/OS. It is emphasized that the operation diagram depiction of the server computing device 10 is exemplary and not intended to imply a specific implementation and/or configuration. |
| [0057] Figure 2C is a schematic diagram illustrating various functional components of the software application 30 configured to implemented on one or more of computing devices 10 and 20. As illustrated, the software application 30 includes several functional components, which include an outfit compiler 32, user interface 28, device components 26 ( e.g. camera, GPS, etc.), cooperating 3rd party applications 34, communications links among networked users 36, push messaging system 38, and video chat components 39. One or more of the functional components illustrated may be used to aid in the acquisition, development, and management of user wardrobe data. For instance, one functional components 28 guide the user through a series of inputs designed create a virtual wardrobe | [0035] The software application 30 can comprise the client application 30c and the server application 30s. Accordingly, certain functions can be implemented on the server computing device 10 and other functions can be implemented on the client computing devices 20. Software application 30, client application 30c, server application 30s may be used interchangeably herein. |

26

| Beckham – Filed July 7, 2015 | Welspun – Filed August 31, 2015 |
|---|---|
| based on the user's physical wardrobe in a simple and interactive way. And outfit compiler 31 learns a user's style preferences based on outfit selection and other user data. Furthermore, one or more of the functional components may implement one more aspects of the methods described herein. The software application 30 can comprise the client application 30c and the server application 30s. Accordingly, certain functions can be implemented on the server computing device 10 and other functions can be implemented on the client computing devices 20. Software application 30, client application 30c, server application 30s may be used interchangeable herein. | |

89.     The language from Ms. Beckham's provisional application that Mr. Grissett incorporates into Welspun's Application is specific to garments and, therefore, is not mere background information.

90.     In Welspun's Applications, Grissett defines augmented reality, or "AR," as:

> [0002]   Augmented reality (AR) is a direct or indirect view of a physical, real-world object that is augmented (or supplemented) by computer-generated elements or sensory inputs such as sound, video, graphics or GPS data.   AR technology functions by enhancing one's current perception of reality.   AR technology can be implemented in the physical world whereby computer generated elements are projected onto physical objects.   Alternatively, AR technology can be implemented through computing devices whereby computer generated elements are overlaid onto images of physical objects captured by the computing device.   Advances in computing, such as user interface technologies, data processing, object recognition have created new opportunities for implementing augmented reality technologies on mobile computing devices, such as smartphones and tablets.

(Ex. J-20);

> [0003]   Augmented reality (AR) is a direct or indirect view of a physical, real-world object that is augmented (or supplemented) by computer-generated elements or sensory inputs such as sound, video, graphics or GPS data.   AR technology functions by enhancing one's current perception of reality.   AR technology can be implemented in the physical world whereby computer generated elements are projected onto physical objects.   Alternatively, AR technology can be implemented through computing devices whereby computer generated elements are overlaid onto images of physical objects captured by the computing device.   Advances in computing, such as user interface technologies, data processing, object recognition have created new opportunities for implementing augmented reality technologies on mobile computing devices, such as smartphones and tablets.

(Ex. J-188); and

> Augmented reality (AR) is a direct or indirect view of a physical, real-world object that is augmented (or supplemented) by computer-generated elements or sensory inputs such as sound, video, graphics or GPS data. AR technology functions by enhancing one's current perception of reality. AR technology can be implemented in the physical world whereby computer generated elements are projected onto physical objects. Alternatively, AR technology can be implemented through computing devices whereby computer generated elements are overlaid onto images of physical objects captured by the computing device. Advances in computing, such as user interface technologies, data processing, object recognition have created new opportunities for implementing augmented reality technologies on mobile computing devices, such as smartphones and tablets.

(*See*, U.S. Patent No. 9,524,589 B1 issued to Welspun December 20, 2016 ("the Welspun '589 Patent" or "the '589 Patent") attached hereto as **Exhibit L** at Ex. J-16 (1:19-33)).

91.     Although the core concepts of Ms. Beckham's invention recognized by Grissett include AR, neither "augmented reality" nor "AR" appear anywhere in her Provisional Application.

92.     Grissett takes over four months to draft Ms. Beckham's Provisional Application.

93.     Despite a 9.5-hour time difference between Philadelphia and Mumbai, less than seven (7) weeks elapses between the time Welspun retains Defendant B&H and Grissett completes the India Application.

94.    Grissett drafts *and files* six (6) distinct patent applications for Welspun in less than eight (8) weeks after Welspun retains B&H:

| No. | Name | Filed | Application No. | Country | Issued As | Issue Date |
|---|---|---|---|---|---|---|
| 1 | Mattress Cover and Bed Skirt System | 2015-08-14 | 3092/MUM/2015 | India | | |
| | Mattress Cover and Bed Skirt System | 2015-08-27 | 14/837,788 | U.S. | U.S. Pat. 9,357,863 B1 | 2016-06-07 |
| 2 | Interactive Textile Article and Augmented Reality System | 2015-08-31 | 3334/MUM/2015 | India | | |
| | Interactive Textile Article and Augmented Reality System | 2015-09-16 | 14/856,250 | U.S. | U.S. Pat. 9,524,589 B1 | 2016-12-20 |
| 3 | Package | 2015-09-15 | 275628 | U.S. | | |
| | Package | 2015-09-24 | 29/540,436 | U.S. | U.S. Pat. D798,146 S | 2017-09-26 |
| 4 | Textile Articles and Systems for Liquid Detection | 2015-09-25 | 62/232,443 | U.S. | Abandoned | |
| 5 | Woven Fabric with Bulky Continuous Filaments Yarns and Related Manufacturing Methods | 2015-09-25 | 62/232,769 | U.S. | U.S. Pat. 9,702,064 B2 | 2017-07-11 |
| 6 | Terry Article with Synthetic Filament Yarns and Method of Making Same | 2015-09-10 | 3474/MUM/2015 | India | | |
| | Terry Article with Synthetic Filament Yarns and Method of Making Same | 2015-09-26 | 14/866,916 | U.S. | U.S. Pat. 9,828,704 B2 | 2017-11-28 |

## I.    Grissett Drafts Ms. Beckham's U.S. Non-Provisional and International Applications.

95.    Grissett does not communicate with Ms. Beckham regarding her application between July 2015 and January 2016.

96.    On February 3, 2016, Grissett tells Ms. Beckham "[i]t is time that we discuss the status of your app and if we need to update your patent application to capture any new concepts you have invented in the last six months." *See*, Feb. 3, 2016 6:06 PM email from Grissett attached hereto as **Exhibit M**.

97.    On February 8, 2016, Eckstein provides Grissett with an Excel spreadsheet outlining the concepts that he is working with Ms. Beckham to implement.

98.    Grissett fails to acknowledge, much less act upon, the "new concepts" disclosed to him on February 3, 2016 for more than three (3) months.

99.    On May 18, 2016, Grissett provides Ms. Beckham with "a proposal for moving forward with patent protection for [her] app taking into account the new

concepts [she] ha[s] been working on." *See*, May 18, 2016 6:05 PM email from Grissett attached hereto as **Exhibit N**.

100.   According to Grissett, "[t]wo components" of Ms. Beckham's "patent strategy must be completed by July 7, 2016: 1.  Update and convert your U.S. provisional application into one (or more) U.S. *utility* patent applications; and 2. Preserve international patent rights with one (or more) international patent application (also called a 'PCT application'), if warranted."  Ex. N-1.

101.   On June 22, 2016, Grissett details his understanding of Ms. Beckham's "'Product Images over Wireframe/Silhouettes' inventive concept'" and provides her with a set of draft claims.  *See*, June 22, 2016 12:40 AM email from Grissett attached hereto as **Exhibit O**.  Per Grissett:

> The human form model is defined in part by various point pairs that are associated with different body parts/locations on the human form. These point pairs have a defined relationship that is common to all body types.



The system applies a grid to the human form model… The grid includes lines and intersections points. There are different line types, shown in different colors, that are related to different zone or part of the human body. The grid lines/intersection points are associated with various points pairs in the human model form…

When a particular fashion item is 'selected' by the system for an outfit, data/tags related to that fashion item are used to configure the fashion item onto the human form model. The grid is used for this purpose. For instance, the system will associate particular fashion item with a particular set of lines and intersection points… The association is also related to the point pairs on the human form, which helps scale the fashion item for fit, style, etc. For example, a tight fitting tank-top would be associated with lines and points that are closet [*sic*] fitting to the 'cover layer' of a human form, the appropriate neckline, and the appropriate sleeve length line. The system can reconfigure/create a representation of the associated fashion item onto the line/intersection

points on the grid based on the data/tags associated with fashion item and the particular point pairs on the human form model… The user will only see a human form and the red tank top…

The system can overly an 'outer' fashion item over the 'cover' layer clothing item… The layering data is based on the location/layer data associated with the fashion item.

…

For shoes, the system selects a shoe based on user inputs as noted above. The system configures/creates a representation of the shoe based on the tags/data associated with the particular shoe type selected by the system. A shoe associated with the grid is shown below in Figure E. Within the grid are defined relationships among various aspects of a shoe represented by the green, yellow, red, and orange lines…



Ex. O-1 – Ex. O-4.

102.   Grissett's June 22, 2016 draft claims specifically include "wireframe" as an element:

> 8.     The system of claim 1, wherein each electronic fashion item model includes a fashion item wireframe that corresponds to the fashion item type.

> 10.   The system of claim 9, wherein the fashion item wireframe is includes a second plurality of pairs of points and a second spatial arrangement of the second plurality of pairs of points, wherein the second spatial relationship is associated with the fashion item type.

Ex. O-9.

103.   Later that afternoon, Grissett recognizes "three components" fundamental to Ms. Beckham's invention: "the human form model, a grid, and the garment item."  *See*, June 22, 2016 3:06 PM email from Grissett attached hereto as **Exhibit P** at Ex. P-1 and Ex. P-2.

104.   On July 6, 2016 at 1:47 PM, Grissett sends Ms. Beckham another set of draft claims.  Said July 6, 2016 1:47 PM email is attached hereto as **Exhibit Q**.

105.   Grissett's July 6, 2016, draft claims also reference "wireframe" as a required element:

> 58.   The method of claim 55, wherein the generating step includes creating a fashion item wireframe associated with the fashion item type and including the fashion item color scheme.

*Id*. at Ex. Q-76.

106.   On July 7, 2016, Grissett files a non-provisional patent application with the U.S. Patent and Trademark office on behalf of Ms. Beckham ("Ms. Beckham's Non-Provisional Application").  *See*, July 8, 2016 10:53 AM email from Grissett attaching the as-filed version of Ms. Beckham's U.S. Non-Provisional Application is attached hereto as **Exhibit R**.

107.    Also on July 7, 2016, Grissett files an international patent application on behalf of Ms. Beckham ("Ms. Beckham's International Application").  *See*, July 7, 2015 5:04 PM email from Michael Jolly attaching filing receipt and Ms. Beckham's as-filed International Application is attached hereto as **Exhibit S**.

108.    Ms. Beckham's U.S. Non-Provisional Application and her International Application contain identical specifications and claims.

109.    On July 8, 2016, Grissett sends Ms. Beckham her as-filed U.S. Non-Provisional Application.  Ex. R-1.

110.    After sending Ms. Beckham draft claims on July 6, 2016 and before filing her U.S. Non-Provisional and International Applications, Grissett removes all remaining references to "wireframe" from the claims:

> 58.    The method of claim 55, where the data base includes one or more pre-defined virtual outfits, wherein the one or more pre-defined virtual outfits at least partially define the association

> of the plurality of electronic fashion item models with the lifestyle demographic type, the style genre, and the selected event,
>     wherein the step of compiling the virtual outfit includes compiling the at least one virtual outfit based on a) received user inputs for the lifestyle demographic type, the style genre, and a selected event among the plurality of events, and b) the association at least partially defined by the one or more pre-defined virtual outfits.

Ex. R-82 – Ex. R-83.

111.    Despite Grissett's prior acknowledgments that the "wireframe" is a core concept of Ms. Beckham's invention, all references thereto are removed from the claims in her U.S. Non-Provisional and International Applications.

112.    As shown in the below comparison between the July 2015 Provisional and July 2016 Non-Provisional Applications, Grissett deleted all references to "wireframe" from the claims:

26.    The system of claim 1, wherein each electronic fashion item model further includes at an fashion item layer indication wireframe associated with the fashion item type and including the fashion item color

30.    The system of claim 1, wherein the at least one of the plurality of electronic fashion item models of the virtual outfit include a garment item model, the garment item model including a garment wireframe associated with the fashion item type and the fashion item color scheme.

31.    The system of claim 30, wherein a user interface is configured to layer the fashion item type and the item color scheme on the garment wireframe.

32.    The system of claim 30, wherein the garment wireframe is includes plurality of pairs of points, each pair of point associated with a different location a human form, wherein the plurality

63.    of the plurality of electronic generating step includes creating a fashion item models wireframe associated with the lifestyle demographic fashion item type, and including the style genre, and the selected event. fashion item color,

wherein the step of compiling the virtual outfit includes compiling the at least one virtual outfit based on a) received user inputs for the lifestyle demographic type, the style genre, and a selected event among the plurality of events, and b) the association at least partially defined by the one or more pre-defined virtual outfits.

~~74~~ 67. The method of claim ~~65~~72, wherein the step of ~~generating~~ compiling the virtual ~~electronic fashion item model~~ outfit includes ~~combining a garment wireframe and~~ compiling the at least one virtual outfit based on one or more selected weather contexts selected by ~~fashion item type and~~ the ~~item color scheme~~ user.

68. The ~~system~~ method of claim ~~65~~72, wherein the ~~garment wireframe is based on a~~ at least one of the plurality of electronic fashion item models of the at least one virtual outfit includes at least one of an upper body garment item model, a lower body garment item model, and a footwear item model.

Said comparison is attached hereto as **Exhibit T.**

**J.  U.S. Patent No. 9,524,589 B1 Issues to Welspun on December 20, 2016.**

113.  Grissett drags out the prosecution of Ms. Beckham's Application.

114.  At the same time, Grissett expedites the prosecution of Welspun's application.  As a result, Welspun is issued U.S. Patent No. 9,524,589 B1 (the "Welspun '589 Patent") for Interactive Textile Article and Augmented Reality System in less than 15 months on December 20, 2016.  *See*, Ex. J-1.

115.  "[T]extile article," as defined by the Welspun '589 Patent, is not limited to a duvet cover and, in fact, specifically includes "a garment."  Ex. J-16 (1:34), Ex. J-20 (9:7-9), Ex. J-23 (Claim 2 at 15:62-64).

116.  In fact, although Grissett filed a provisional application for Welspun on September 25, 2015 for "Bedding Articles," this application was abandoned.  *See*,

Ex. K-1.  Thus, if Grissett intended for the Welspun '589 Patent to be limited to a duvet cover, he knew how to draft the claims accordingly.

117.   Welspun's U.S. Non-Provisional Application is not published prior to the issuance of the '589 Patent.

118.   At the time the Welspun '589 Patent issues on December 20, 2016, Grissett has no patentable claims on file for Ms. Beckham.

**K.    B&H Advises Ms. Beckham that International Patent Rights are Not Worth Pursuing.**

119.   On September 30, 2016, the International Searching Authority issues a written opinion rejecting 104 of 104 claims in Ms. Beckham's International Application.  A true and correct copy of said September 30, 2016 Written Opinion is attached hereto as **Exhibit U**.

120.   Between November 2016 and January 1, 2018, neither Grissett nor anyone else at B&H communicates with Ms. Beckham regarding her International Application.

121.   At 7:04 PM on January 2, 2018, Grissett informs Ms. Beckham via text message that he is out of town, but they "still need to decide (by tomorrow) if [she] want[s] foreign patents of [her] first patent application."  Said Jan. 2, 2018 text message is attached hereto as **Exhibit V**.

122.   Ms. Beckham responds to Grissett at 9:11 PM, stating "[u]nfortunately I feel there's just been a lot of things that haven't been discussed on how this

[(international patent rights)] will benefit Lutzy's IP. With very little guidance on everything, I just don't see the value with moving forward international when I'm not even sure my patent is defensible here in the U.S." Ex. V-1.

123. At 5:11 AM January 3, 2018, Grissett responds by stating that he "believe[s] there are patentable features in [Ms. Beckham's] patent application" and that he "would not give up on that yet." Ex. V-1.

124. Unable to get a straightforward answer, Ms. Beckham's frustration continues to grow. At 6:48 AM on January 3, 2018, Ms. Beckham states:

> Greg[,] here's the bottom line. I have not been given specific reasoning as to why my 'inventions/claims' are wroth pursuing internationally. What are my claims that stand a chance and why? I need more definite answers other than 'I believe you have patentable features. Don't give up on that yet.'
>
> Well what are those features Greg and why should I not give up on those yet? What is the reasoning? No clear-cut statements have been communicated to me that resemble anything close to these examples: 'Britt bc [*sic*] of claims x, y, & z... and the inventive steps and/or novelty that were resubmitted back to the patent office with additional drawings gives me confidence that you still have a chance.'
>
> 'Britt, claims X-Z support your unique invention, X, and why internationally you need to file. The drawings that I resubmitted back to the patent office displayed the inventive steps and the novelty necessary to support invention X, and this gives me confidence.'
>
> Im [*sic*] wanting specifics as to what makes my patent defensible and why international patents are worth pursuing.

Ex. V-1.

125.    Eleven minutes later at 6:59 AM, Grissett tells Ms. Beckham: "I don't think international patents are worth pursuing… You would only need patents in foreign countries in the event you want to sue a company in those foreign countries." Ex. V-1.

126.    At 9:37 AM, Grissett advises Ms. Beckham that "International rights are good if you want to sue or if want [*sic*] to license. But they are very expensive. This is more of a balance between costs and rights obtained. Given what we know now about your business, foreign patents are not critical to your business. At the time of filing the pct [*sic*], I don't think we knew that. We do know that Us [*sic*] patent rights are important." Ex. V-2.

127.    Ms. Beckham follows up with Grissett at 9:40 AM by asking why "this wasn't even brought to [her] attention" at the time he filed the international application a year and a half earlier. Ex. V-2.

128.    On January 4, 2018 at 10:19 AM, Grissett informs Ms. Beckham that the deadline to file internationally is January 7, 2018. Ex. V-3.

**L.    Actions of B&H's Attorneys are in Furtherance of and Within the Scope of B&H's Business.**

129.    The actions of B&H's attorneys, including without limitation, Rosedale, Clare, and Grissett were in furtherance of their employment at and the business of Defendant B&H.

130. The actions of B&H's attorneys, including without limitation, Rosedale, Clare, and Grissett were within the scope of their employment at and the business of Defendant B&H.

131. Defendant B&H's is vicariously liable for the actions of its attorneys, including without limitation, Rosedale, Clare, and Grissett under the theory of *respondeat superior*.

**M.** **Ms. Beckham Replaces B&H with Fish & Richardson.**

132. By 2018, Ms. Beckham is frustrated with Grissett and B&H's failure to obtain a patent. As such, Ms. Beckham replaces B&H with Tracy Hitt from the Atlanta office of Fish & Richardson.

133. Both Ms. Beckham's Smart Closet invention disclosed to Defendant B&H and the Welspun '589 Patent implicate: (a) the use of a camera to capture an image of a garment; (b) identifying patterns and other visual features of a garment; (c) using edge detection to identify features on a garment; (d) generating a digital representation of a garment's characteristics; (e) allowing the user to modify the digital representation of a garment; (f) updating the digital representation of a garment based on user inputs; (g) allowing the user to modify the updated digital representation of a garment; and (h) generating an updated digital representation of a garment based on user inputs.

134.   Three (3) years after Ms. Beckham retained Defendant B&H, Grissett has not obtained a single patent for her.

135.   Ms. Beckham terminates Grissett and B&H as her patent counsel in 2018.

136.   On or about August 23, 2018, Ms. Beckham retains Tracy Hitt from Fish & Richardson in Atlanta, Georgia.

137.   Mr. Hitt formally notifies the U.S. Patent and Trademark Office of his engagement on August 27, 2018.

138.   Mr. Hitt revises all claims drafted previously by Grissett.  Namely, Mr. Hitt reinserts the previously deleted "wireframe" concept.

139.   Mr. Hitt salvages Ms. Beckham's U.S. Non-Provisional Application and on July 2, 2019, U.S. Patent 10,339,593 B2 issues to Ms. Beckham.

140.   Due to B&H and Grissett's failure to act on Ms. Beckham's International Application, Mr. Hitt is unable to secure international patent protection for Ms. Beckham's inventions.

**N.**   **Ms. Beckham is "Blocked" by at Least Claim 17 of the Welspun '589 Patent.**

141.   Ms. Beckham is concerned that if she practices her invention, she may have problems with the Welspun '589 Patent.

142.   Claim 17 of the Welspun '589 Patent provides:

17. A method for progressing through augmented reality on a computing device, the method comprising the steps of:

  scanning, via the computing device, a portion of a textile article that includes a design object;

  identifying with a processor of the computing device one or more design object identifiers of the design object in the scanned portion of the textile article;

  compiling with the processor a design object depiction with the one or more design object identifiers that were identified from the scanned portion of the textile article, wherein the design object depiction is related to the design object and the portion of the textile article;

  initiating, via inputs into a user interface running on the computing device, a first augmented content level of a plurality of augmented content levels running on the computing device, the first augmented content level configured to display on the user interface: 1) the design object depiction with an image of the portion of the textile article, 2) one or more first augmentation elements that are related to the design object and the portion of the textile article, and 3) at least one first input element that controls at least one of the design object depiction and the one or more first augmentation elements;

  in response to inputs into the at least one first input element received via the user interface, initiating a second augmented content level; and

  progressing through a second augmented content level of the plurality of augmented content levels in response to inputs received via the user interface, wherein the second augmented content level is configured to display on the user interface: 1) the design object depiction with the image of the portion of the textile article, 2) one or more second augmentation elements that are related to the design object and the portion of the textile article, and 3) at least one second input element that controls at least one of the design object depiction and the one or more second augmentation elements.

Ex. L-23 – Ex. L-24 (16:47 – 17:17).

143.   Accordingly, Ms. Beckham asks Mr. Hitt for his analysis as to whether the Welspun '589 Patent presents any legal obstacles to her and/or her business.

144. On July 1, 2022, Mr. Hitt opines in a letter to Ms. Beckham that she is "blocked" from practicing her invention by at least Claim 17 of the Welspun '589 Patent. A true and correct copy of said July 1, 2022 Opinion Letter is attached hereto as **Exhibit W**.

145. As the first to file, Ms. Beckham will likely prevail in any litigation with Welspun regarding the '589 Patent.

146. Despite Ms. Beckham's likely success, litigation with Welspun over the '589 Patent will cost her considerable time and money. Her attorneys' fees alone will likely exceed $1 million.

147. Because there is a substantial likelihood of litigation between Ms. Beckham and Welspun, Ms. Beckham's interests are unquestionably adverse to Welspun's interests.

148. B&H and Grissett continued to represent both Ms. Beckham and Welspun despite the obvious adversity of their respective interests.

149. While Ms. Beckham is likely to prevail in any litigation with Welspun over the '589 Patent, this does not obviate the fact that their interests are directly adverse.

150. If and to the extent the requirements of O.C.G.A. § 9-11-9.1 apply to the claims asserted herein, the affidavit of David Hricik is attached hereto as **Exhibit X** and incorporated herein by express reference. Said Affidavit sets forth at least

one act or omission by Defendants supporting the claims asserted herein and the factual basis therefor.

## COUNT I – BREACH OF FIDUCIARY DUTIES

151.     Plaintiffs incorporate by express references the Paragraphs 1 – 150 as if fully restated and set forth herein.

152.     The attorney-client relationship is founded in principle upon the elements of trust and confidence on the part of the client and of undivided loyalty and devotion on the part of the attorney.

153.     As a result of the confidential nature of the attorney-client relationship, attorneys owe their clients certain fiduciary duties.

154.     The fiduciary duties attorneys owe their clients include those of loyalty, to exercise the utmost good faith, to apply their best skill, zeal, and diligence in representing the client, and to avoid interests or actions that are incompatible with the client's interests.

155.     As Plaintiffs' attorneys, Defendants B&H and Grissett owed Ms. Beckham and Lutzy fiduciary duties of loyalty, to exercise the utmost good faith, to apply their best skill, zeal, and diligence in representing them, and to avoid interests or actions that were incompatible with her interests.

156.     Defendants B&H and Grissett's fiduciary duties owed to Plaintiffs also included the duty to act consistently with the standards of legal ethics.

157.   The fiduciary duties of loyalty and utmost good faith owed by Defendants B&H and Grissett to Plaintiffs require honesty and full disclosure.

158.   As part of Defendants' fiduciary duties, they were required to inform Plaintiffs of all pertinent and relevant information, to avoid conflicts of interest, and to preserve their confidences.

159.   37 C.F.R. § 11.107 governs conflicts of interests for attorneys practicing before the U.S. Patent and Trademark Office.

160.   Pursuant to 37 C.F.R. § 11.107(a), attorneys practicing before the U.S. Patent and Trademark Office "shall not represent a client if the representation involves a concurrent conflict of interest.

161.   Pursuant to 37 C.F.R. § 11.107(a)(1), "[a] concurrent conflict of interests exists if … [t]he representation of one client will be directly adverse to another client."

162.    Pursuant to 37 C.F.R. § 11.107(a)(2), "[a] concurrent conflict of interests exists if … [t]here is a significant risk that the representation of one or more clients will be materially limited by the practitioner's responsibilities to another client, a former client or a third person or by a personal interest of the practitioner."

163.   Because Defendant B&H was representing Plaintiffs before the U.S. Patent and Trademark Office, it was prohibited from representing Welspun if the representation was directly adverse to Plaintiffs' interests.

164. Because Defendant B&H was representing Plaintiffs before the U.S. Patent and Trademark Office, it was further prohibited from representing Welspun if there was a significant risk that the representation would be materially limited by its responsibilities to Plaintiffs.

165. Because Defendant B&H was representing Plaintiffs before the U.S. Patent and Trademark Office, it was further prohibited from representing Plaintiffs if there was a significant risk that the representation would be materially limited by the personal interest of a B&H attorney.

166. Both Ms. Beckham's Smart Closet invention and the Welspun '589 patent implicate the use of an augmented reality platform to display digital representations of garments, modify digital representations of garments, and display modified digital representations of garments.

167. Defendant B&H's representation of Welspun in the prosecution of multiple patent applications implicating the use of an augmented reality platform to display digital representations of garments, modify digital representations of garments, and display modified digital representations of garments was directly adverse to Plaintiffs' interests in their Smart Closet invention.

168. Defendant B&H's representation of Welspun in the prosecution of multiple patent applications implicating the use of an augmented reality platform to display digital representations of garments, modify digital representations of

garments, and display modified digital representations of garments presented a significant risk of materially limiting its responsibilities to Plaintiffs, including its responsibility to file additional patent applications embodying their Smart Closet invention.

169.    Defendant B&H's representation of Welspun in the prosecution of multiple patent applications implicating the use of an augmented reality platform to display digital representations of garments, modify digital representations of garments, and display modified digital representations of garments did in fact materially limit its responsibilities to Plaintiffs, including its responsibility to file additional patent applications embodying their Smart Closet invention.

170.    Defendant B&H was prohibited from representing Welspun because its representation of Welspun was directly adverse to Plaintiffs' interests.

171.    Defendant B&H was prohibited from representing Welspun because there was a significant risk that its representation of Welspun would materially limit its fiduciary responsibilities owed to Plaintiffs.

172.    During B&H's concurrent representation of Plaintiffs and Welspun, B&H acted to the benefit of Welspun at Plaintiff's expense.  These actions include, but are not limited to, the following:

(a)    Cutting and pasting substantial portions of Plaintiffs' unpublished, provisional application into Welspun's applications;

(b)     Defining "textiles" to include "garments" in the Welspun applications when in fact, Welspun is not in the "garment" industry;

(c)     Removing "wireframe" from Plaintiffs' non-provisional and international claims; and/or

(d)     Expediting prosecution of Welspun's applications to ensure that Welspun's patents would issue before Plaintiffs' patent.

173.   One or more of Welspun's patented claims obtained by B&H covers features of Plaintiffs' "Smart Closet."

174.   Plaintiffs' inability to practice their "Smart Closet" invention due to the Welspun patents has prevented them from entering the market.

175.   Plaintiffs' inability to practice their "Smart Closet" invention due to the Welspun patents has cost Plaintiffs their entire revenue stream, thus resulting in the loss of substantial revenue.

176.   If Plaintiffs promote or offer their inventions for sale to the public, they are at substantial risk of being sued by Welspun for patent infringement.

177.   Although Plaintiffs will likely prevail in a patent infringement action by Welspun, obtaining victory will come at substantial cost in both time and money. Plaintiffs' attorneys' fees would likely exceed $1 million to defend such a patent infringement action.

178.   Alternatively, Plaintiffs will be forced to challenge the validity of Welspun's patent(s).   This will also result in significant fees and expenses to Plaintiffs that will likely exceed $1 million.

179.   Because Defendant B&H's representation of Welspun was directly adverse to Plaintiffs' interests, its representation of Welspun resulted in a concurrent conflict of interest.

180.   Because there was a significant risk that Defendant B&H's representation of Welspun would materially limit its responsibilities owed to Plaintiffs, Defendant B&H's representation of Welspun resulted in a concurrent conflict of interest.

181.   Because Defendant B&H's representation of Welspun involved a concurrent conflict of interest, it was prohibited from representing Welspun pursuant to 37 C.F.R. § 11.107(a)(1) and (2).

182.   Defendant B&H breached its fiduciary duties of loyalty, utmost good faith, and to avoid conflicts of interest or actions incompatible with Plaintiffs' interests by representing Welspun in the prosecution of multiple competing patent applications implicating the core features of Plaintiffs' Smart Closet invention.

183.   Defendant B&H breached its fiduciary duties of loyalty, utmost good faith, and to avoid conflicts of interest or actions incompatible with Plaintiffs' interests by knowingly operating under a conflict of interest.

184. Defendant B&H's representation of Welspun was directly adverse to its representation of Plaintiffs and, therefore, constituted a concurrent conflict of interest in violation of 37 C.F.R. § 1.107(a)(1).

185. As a result of Defendant B&H's representation of Welspun in the prosecution of multiple competing patent applications, there was a substantial risk that B&H's representation of Welspun would materially and adversely affect its duties and responsibilities to Plaintiffs.

186. Defendant B&H's fiduciary duties owed to Plaintiffs required that it disclose to them that it was representing Welspun in the prosecution of multiple competing patent applications.

187. Defendant B&H breached its fiduciary duties owed to Plaintiffs by intentionally and knowingly failing to disclose the fact that it was representing Welspun in the prosecution of competing patent applications.

188. As a direct and proximate result of Defendant B&H's breaches of its fiduciary duties owed to Plaintiffs, Plaintiffs have sustained significant damages, including, but not limited to, loss of patent royalties from Welspun, lost business opportunities, and mental anguish suffered by Ms. Beckham.

189. As a direct and proximate result of Defendant B&H's breaches of its fiduciary duties owed to Plaintiffs, Plaintiffs are entitled to recover damages in an amount to be determined by the enlightened consciousness of an impartial jury.

190.   Defendant B&H's actions in breach of its fiduciary obligations owed to Plaintiffs were intentional, reckless, and with total disregard for the consequences thereof.

## COUNT II – BREACH OF FIDUCIARY DUTIES (BY DEFENDANT B&H)

191.   Plaintiffs incorporate by express references the Paragraphs 1 – 190 as if fully restated and set forth herein.

192.   Defendant B&H's fiduciary duty of loyalty requires that it check for potential conflicts of interest before agreeing to represent a new client.  Namely, Defendant B&H must ensure that a potential new client's interests are neither adverse nor likely to become adverse to those of any existing clients.

193.   Defendant B&H's duty of loyalty also requires that it ensure that a client's interests are neither adverse nor likely to become adverse to the personal interests of any of B&H's attorneys.

194.   Defendant B&H's fiduciary duty of loyalty owed to Plaintiffs as existing clients required B&H perform a proper analysis sufficient to identify any existing or potential conflicts of interest before agreeing to represent Welspun.

195.   Defendant B&H systematically and routinely failed to run proper conflicts checks while representing Plaintiffs.

196.   Had B&H performed a proper conflicts analysis before accepting Welspun as a new client, B&H would have known that there was a substantial

likelihood that Plaintiffs' interests were or would become adverse to those of Welspun.

197.   Had B&H performed a proper conflicts analysis before recommending Ms. Beckham hire Eckstein, B&H would have known that there was a substantial likelihood that Plaintiffs' interests were or would become adverse to the personal interests of former B&H attorney Tom "TC" Clare.

198.   Defendant B&H breached its fiduciary duty of loyalty owed to Plaintiffs by failing to perform a proper analysis sufficient to identify the actual and potential conflict between Plaintiffs' interests and those of Welspun.

199.   As a direct and proximate result of Defendant B&H's failure to perform proper conflicts analysis before accepting Welspun as a new client, Plaintiffs have suffered and will continue to suffer substantial harm, including, but not limited to, loss of patent royalties from Welspun, lost business opportunities, and mental anguish suffered by Ms. Beckham.

200.   As a direct and proximate result of Defendant B&H's failure to perform proper conflicts analysis before accepting Welspun as a new client, Plaintiffs are entitled to recover monetary damages in an amount to be determined by the enlightened consciousness of an impartial jury.

## COUNT III – FRAUDULENT CONCEALMENT/SUPPRESSION OF MATERIAL FACT

201.  Plaintiffs incorporate by express references the Paragraphs 1 – 200 as if fully restated and set forth herein.

202.  A client's trust and confidence in his or her attorney is fundamental to the attorney-client relationship.

203.  The relationship between attorney and client is confidential by nature.

204.  As a result of the confidential nature of the attorney-client relationship, an attorney must disclose to the client information material to the relationship.

205.  Defendant B&H, by and through its attorneys assigned to Plaintiffs' matters including without limitation, Rosedale, Clare, and Grissett had a confidential relationship with Plaintiffs.

206.  As Plaintiffs' attorneys, Defendant B&H had a duty to disclose information material to Plaintiffs' choice to continue their attorney-client relationship with B&H.

207.  The existence of an actual or potential conflict of interest is information material to the attorney-client relationship that the attorney must disclose to a client.

208.  Prior to accepting Welspun as a client, Defendant B&H a duty to disclose to Plaintiffs that its representation of Welspun presented a significant risk of a concurrent conflict of interest.

209. After accepting Welspun as a client, Defendant B&H had a duty to disclose to Plaintiffs the existence of the resulting concurrent conflict of interest.

210. The fact that Defendant B&H was engaged by Welspun to prosecute multiple patent applications directly adverse to Plaintiffs' interests was material information that Defendant B&H was required to disclose to Plaintiffs.

211. Defendant B&H's failure to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications directly adverse to Plaintiffs' interests constitutes information material to Plaintiffs' decision to continue their attorney-client relationship with Defendant B&H.

212. Defendant B&H's failure to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications directly adverse to Plaintiffs' interests constituted information material to Plaintiffs' decision to continue disclosing their confidential and proprietary information to Defendant B&H.

213. Defendant B&H had actual knowledge that its representation of Welspun was directly adverse to Plaintiffs' interests.

214. Defendant B&H intentionally concealed the fact that it was representing Welspun in the prosecution of multiple competing patent applications with knowledge that its representation of Welspun was directly adverse to Plaintiffs' interests.

215. Defendant B&H intentionally concealed the fact that it was representing Welspun in the prosecution of multiple competing patent applications with actual knowledge that it had a duty to disclose this information to Plaintiffs.

216. Defendant B&H knowingly failed to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications with the intention of inducing Plaintiffs to continue their attorney-client relationship with Defendant B&H.

217. Defendant B&H knowingly failed to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications with the intention of inducing Plaintiffs to continue disclosing their confidential and proprietary information to Defendant B&H.

218. Defendant B&H knowingly failed to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications with the intention of deceiving and misleading Plaintiffs into believing there was no conflict of interest.

219. Plaintiffs justifiably relied to their detriment on Defendant B&H's failure to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications or the resulting concurrent conflict of interest by continuing their attorney-client relationship with Defendant B&H.

220.   Plaintiffs justifiably relied to their detriment on Defendant B&H's failure to disclose the fact that it was representing Welspun in the prosecution of multiple competing patent applications or the resulting concurrent conflict of interest by continuing to disclose their confidential and proprietary information to Defendant B&H.

221.   No amount of diligence could have led Plaintiffs to discover either the fact that Defendant B&H was representing Welspun in the prosecution of multiple competing patent applications or the resulting concurrent conflict of interest.

222.   As a direct and proximate result of Defendant B&H's intentional and knowing failure to disclose to Plaintiffs that it was representing Welspun in the prosecution of multiple competing patent applications or the resulting concurrent conflict of interest, Plaintiffs have suffered substantial harm including, but not limited to, loss of patent royalties from Welspun, lost business opportunities, and mental anguish suffered by Ms. Beckham.

223.   As a direct and proximate result of Defendant B&H's intentional and knowing failure to disclose to Plaintiffs that it was representing Welspun in the prosecution of multiple competing patent applications or the resulting concurrent conflict of interest, Plaintiffs are entitled to recover damages in an amount to be determined by the enlightened consciousness of an impartial jury.

224. Defendant B&H's failure to disclose information material to its representation of Plaintiffs was intentional, reckless, and with total disregard for the consequences thereof.

## COUNT IV – PUNITIVE DAMAGES

225. Plaintiffs incorporate by express references the Paragraphs 1 – 224 as if fully restated and set forth herein.

226. Defendants' conduct was willful, malicious, fraudulent, wanton, and oppressive and shows that entire want of care which raises the presumption of conscious indifference to the consequences thereof.

227. Defendants' willful, malicious, fraudulent, wanton, and oppressive conduct was specifically intended to cause harm to Plaintiffs and did in fact cause harm to Plaintiffs.

228. Pursuant to O.C.G.A. § 51-12-5.1, Plaintiffs are entitled to recover uncapped punitive damages in an amount to be determined by the enlightened consciousness of an impartial jury to punish and deter Defendants from repeating or continuing such unlawful conduct.

## COUNT V – ATTORNEYS' FEES PURSUANT TO O.C.G.A. § 13-6-11

229. Plaintiffs incorporate by express references the Paragraphs 1 – 228 as if fully restated and set forth herein.

230. Defendants have been stubbornly litigious, have acted in bad faith, and have caused Plaintiffs unnecessary trouble and expense.

231. Plaintiffs are, therefore, entitled to recover all reasonable and necessary attorneys' fees and litigation expenses incurred as a result of having to file this lawsuit.

## JURY TRIAL DEMANDED

232. Plaintiffs demand a trial by an impartial jury of their peers.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray upon this Court for the following relief:

(a)     Summons be issued and Defendant be served with process;

(b)     Plaintiffs be awarded general and special damages in an amount to be proven at trial;

(c)     Plaintiffs be awarded uncapped punitive damages pursuant to O.C.G.A. § 51-12-5.1;

(d)     Plaintiffs be awarded all reasonable and necessary attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11; and

(e)     Any such other and further relief deemed just and proper by this Court.

This 9th day of February, 2023.

COCHRAN & EDWARDS, LLC

2950 Atlanta Road SE
Smyrna, Georgia 30080-3655
(770) 435-2131 (*telephone*)
(770) 436-6877 (*facsimile*)
randy@cochranedwardslaw.com
paul@cochranedwardslaw.com

*/s/Randy Edwards*

R. Randy Edwards
Georgia Bar No. 241525
Paul A. Piland
Georgia Bar No. 558748

INSIGHT PLC

860 Johnson Ferry Road NE, #140-176
Atlanta, Georgia 30342
(770) 990-9982 (*telephone*)
jburt@insightplc.com

*/s/ Jacqueline K. Burt*

Jacqueline K. Burt
Georgia Bar No. 425322

578 Washington Blvd. #503
Marina del Rey, California 90292
(818) 744-8714 (*telephone*)
(818) 337-0383 (*facsimile*)
swritcheson@insightplc.com

*/s/ Steven W. Ritcheson*

Steven W. Ritcheson
(*Admitted Pro Hac Vice*)
California Bar. No. 174062

## **LOCAL RULE 7.1D CERTIFICATION**

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.


/s/ *Randy Edwards*

Randy Edwards
Georgia Bar No. 241525

## **CERTIFICATE OF SERVICE**

This is to certify that on this day, I have electronically filed the within and foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ Randy Edwards*

R. Randy Edwards
Georgia Bar No. 241525
Paul A. Piland
Georgia Bar No. 558748